**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

--------------------------------------------------

**IN RE**

**UNITED STATES OF AMERICA,**

vs.

**I. LEWIS LIBBY,**

**Criminal Case No. 05-394 (RBW)**

--------------------------------------------------  **x**

CASE NUMBER  1:07MS00052

JUDGE: Reggie B. Walton

DECK TYPE: Miscellaneous

DATE STAMP: 02/02/2007

: **HEARING REQUESTED**
:
:
:

FILED
FEB - 4 '07

# APPLICATION FOR ACCESS TO TRIAL EXHIBITS
## PLAYED TO THE JURY

Pursuant to Local Criminal Rule 57.6, ABC, Inc.; the American Society of Newspaper

Editors; the Associated Press; Bloomberg News; Cable News Network LP, LLLP; CBS

Broadcasting, Inc.; Dow Jones & Company, Inc.; The E.W. Scripps Company; The Hearst

Corporation; The McClatchy Company; NBC News; National Public Radio, Inc.; the Newspaper

Association of America; the Radio-Television News Directors Association; the Reporters

Committee for Freedom of the Press; the Society of Professional Journalists; Tribune Company;

USA TODAY; and The Washington Post (hereafter the "Media Applicants") respectfully submit

this Application to exercise their constitutional and common-law rights to inspect and copy the

audio recordings of the Defendant's grand jury testimony that will be played in open court.[1]

While this trial undoubtedly presents many close questions of law for this Court to

resolve, this is not one of them.  The issue of access to audio or video tapes used as evidence in a

---

[1] Each of the Media Applicants has an interest in these proceedings arising out of the news
coverage of the trial provided by their employees and/or members, and each previously has submitted an
Application concerning various access issues in this case.

criminal trial has reached the D.C. Circuit almost half a dozen times. Every single case has required the release of such tapes to the press and public.

The Circuit has made expressly clear that, absent truly extraordinary circumstances, no cognizable threat to fair trial rights is posed by the release of audiotape evidence as soon as it is played to the jury. As a result, it has consistently ordered the release of material in high-profile cases where the evidence was far more arguably prejudicial than the tape at issue here, such as undercover videotapes of FBI stings and surreptitiously recorded conversations. Accordingly, the tapes of the Defendant's grand jury testimony should be treated the same as all other trial exhibits in this case and made available for inspection and copying as soon as practicable following their publication to the jury.

## ARGUMENT

I.    CONTROLLING CIRCUIT CASE LAW REQUIRES RELEASE OF AUDIOTAPES PLAYED TO THE JURY IN ALL BUT THE MOST EXTRAORDINARY CIRCUMSTANCES

Both the First Amendment and the common law afford the public and the press a presumptive right of access to judicial proceedings in criminal cases, including a right of access to trial exhibits. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571 (1980) (First Amendment conveys an affirmative, enforceable right of public access to criminal proceedings); *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991) ("The first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed.").

Applied to the issue of access to audiotape evidence, the D.C. Circuit has summed up more than thirty years of its case law on the subject by holding that "our decisions construing the venerable common-law right to inspect and copy judicial records make it clear that audio tapes

enter the public domain once played and received into evidence." *Cottone v. Reno*, 193 F.3d

550, 554 (D.C. Cir. 1999). In fact, as *Cottone* suggests, as a formal matter filing the instant

Application actually gets the law backwards. In every criminal case, access to evidence is

presumed, so the burden is normally on the party seeking an exception to that norm to file a

motion to seal any particular exhibit. *See Washington Post v. Robinson*, 935 F.2d 282, 288

(1991) ("The presumption of openness [of the records of criminal proceedings] may be

overcome only by an overriding interest based on findings that closure is essential to preserve

higher values and is narrowly tailored to serve that interest."). Nonetheless, the Media

Applicants are filing this Application under Local Criminal Rule 57.6 to expedite resolution of

this issue.

The Circuit first addressed the issue during the Watergate-era trial of former Attorney

General John Mitchell, when applicants sought access to copy the White House tapes played at

the trial. The Circuit reversed the trial court's denial of access and held that "a serious question

exists as to whether sealing . . . exhibits played in open court is ever justifiable." *See United

States v. Mitchell*, 551 F.2d 1252, 1260 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon

v. Warner Communications*, 435 U.S. 589 (1978).[2] It ordered the tapes released even though the

copying of such tapes posed substantial administrative and technical problems that are non-

existent today. Since *Mitchell*, the Circuit has never found an instance in which a denial of

access to copy audiotape evidence was justified.

---

[2] The result in *Mitchell* was reversed by the Supreme Court because Congress had passed a statute that governed all questions of public release of the Nixon tapes, which superceded the common-law right recognized by the D.C. Circuit. However, the Circuit has made clear that *Mitchell* remains controlling in this Circuit with regard to application of the common-law right to copy audiotape evidence, repeatedly citing it in subsequent decisions.

Subsequently, the Circuit again reversed a trial court's denial of access to copy tapes in *In re National Broadcasting Company.* 653 F.2d 609, 612 (D.C. Cir. 1981) (hereinafter "*Jenrette*") ("[I]t is now settled that the right [to inspect and copy judicial records] extends to records which are not in written form, such as audio and video tapes.") (footnotes omitted). That case involve undercover videotapes depicting the defendant congressman accepting bribes as part of the FBI's "Abscam" sting operation. Importantly, *Jenrette* relied extensively on the Second Circuit's decision in another Abscam case. *See In re Nat'l Broad. Co.*, 635 F.2d 945, 950 (2d Cir. 1980) (hereinafter "*Myers*"). *Myers* held that:

> Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a Member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation. And there is a significant public interest in affording that opportunity contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial [citations omitted]. When physical evidence is in a form that permits inspection and copying without any significant risk of impairing the integrity of the evidence or interfering with the orderly conduct of the trial, only the most compelling circumstances should prevent contemporaneous public access to it.

*Id.* at 952 (footnote omitted).

In *Jenrette*, no one had asked to copy the tapes until sometime after the trial, so it was not necessary for the Circuit to squarely address the issue of what point in time in a trial the right of access adheres. However, some years later the D.C. Circuit again relied on *Myers* to emphasize the importance of access to audiotapes as soon as they are played to the jury:

> Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most *extraordinary circumstances* to justify restrictions on the

4

> opportunity of those not physically in attendance at the courtroom
> to see and hear the evidence, when it is in a form that readily
> permits sight and sound reproduction.

*United States v. Thompson*, No. 89-3160, 1989 WL 248625, at *2 (D.C. Cir. Oct. 13, 1989) (*per curiam*) (emphasis added) (*quoting Myers*, 635 F.2d at 952). *See also United States v. Millington*, No. 89-3169, 1989 WL 128054 (D.C. Cir. Oct. 6, 1989) (*per curiam*) (summarily affirming order to release videotape). Thus, by this point there is no question that "audio tapes enter the public domain once played and received into evidence." *Cottone*, 193 F.3d at 554. Furthermore, when the criminal trial of presidential assailant John Hinckley, Jr. was held in this court, the trial judge ordered the release of taped conversations between the defendant and actress Jodie Foster after they were played for the jury, holding that even concerns about Ms. Foster's safety were "outweighed by the common law principle" of the right to copy such evidence. *See In re American Broad. Cos.* (hereinafter "*Hinckley*"), 537 F. Supp. 1168, 1173 (D.D.C. 1982).

Numerous other federal courts – far too numerous to cite even a fraction of them – likewise have overruled objections to the release of audio or video tapes once they were entered into evidence at a criminal trial. *See, e.g., United States v. Guzzino*, 766 F.2d 302, 303-04 (7th Cir. 1985) (reversing as abuse of discretion trial judge's refusal to permit media intervenors to copy audiotapes admitted in evidence at trial); *United States v. Criden*, 648 F.2d 814, 829-30 (3d Cir. 1981) (reversing district court's order denying media intervenors' application to copy video and audio tapes admitted in evidence and played in open court). Perhaps the most significant recent example is *United States v. Moussaoui*, 172 Fed. Appx. 1, 6 (4th Cir. 2006), in which the Fourth Circuit held that it was reversible error for the trial court to wait until the end of the trial to provide access to trial exhibits, including a number of audiotapes of events that occurred on

September 11, 2001. *Id.* (granting writ of mandamus and directing district court to provide media one copy of each exhibit admitted into evidence and published to jury "as soon as is practically possible, but in no event later than 10:00 a.m. on the day after the exhibit is published to the jury").

However, though access to audiotape evidence is common throughout the federal Circuits, a survey of the case law suggests that this Circuit has among the strongest views of any in the country regarding the "extraordinary burden" required to overcome the presumption of access to audiotape evidence. *See. e.g., Mitchell*, 551 F.2d at 1260 (any request for access to audiotapes "seek[s] to vindicate a precious common law right, one that predates the Constitution itself"); *Jenrette*, 653 F.2d at 613 ("The court's discretion must "clearly be guided by this country's strong tradition of access to judicial proceedings . . . . Any denial of this 'precious' and 'fundamental' common law right remains subject to appellate review for abuse") (footnotes omitted). As we discuss below, there is nothing "extraordinary" about the facts of this case that could possibly satisfy that very heavy burden.

## II.     AS A MATTER OF LAW, RELEASE OF AUDIOTAPES THAT THE JURY WILL HAVE ALREADY SEEN DOES NOT PREJUDICE THE DEFENDANT'S FAIR TRIAL RIGHTS

The Media Applicants recognize and respect that the Court must vigilantly guard the right of the accused in this case to a fair trial. Furthermore, the Applicants also appreciate the many logistical accommodations the Court has made to facilitate press coverage of this trial. However, we respectfully submit that the argument that release of audiotape evidence would threaten the fairness of a trial by producing sensationalized news coverage, has been made many, many times and consistently rejected as a matter of law.

Even at first blush, that argument is fundamentally inconsistent with the premise of the right to access. If release of a tape threatens a fair trial, then such danger would be posed in every case, since as a practical matter it is only in cases worthy of news coverage that members of the news media ever request copies of taped evidence. The very fact that the law in this Circuit presumes that the right to access adheres as soon as a tape is introduced into evidence requires the presumption that such access does not threaten any fair trial rights.

As a general rule, the right of access "cannot be overcome by the conclusory assertion that publicity might deprive the defendant of [his] right [to an impartial jury]." *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 15 (1986). The argument that access to a tape threatens fair trial rights requires one to speculate that (1) a jury that has been sworn, and instructed to avoid media reports about the trial will disregard those instructions and (2) even if a juror encounters a news report, that merely re-hearing the same tape recording already played in Court will somehow prejudice a juror vastly more than reading a transcript or listening to a reporter summarize the exact same words. The law squarely rejects both parts of this argument.

First, in the absence of any actual evidence to the contrary, courts in high-profile cases are to rely on the presumption that jurors will obey their instructions in determining whether they will be exposed to media coverage. *Myers*, 635 F.2d at 953 ("The jury had already seen and heard the tapes, and [the district court judge] was entitled to rely on the jury's observance of his admonition to avoid exposure to reports of the trial in the news media."); *Valley Broadcasting Co. v. U.S. Dist. Court for Dist. of Nevada*, 798 F.2d 1289, 1297 (9th Cir. 1986) ("mere "speculat[ion] that jurors might not only violate their oaths but be incrementally prejudiced by the tapes themselves" is not sufficient to overcome the right of access to tapes); *In re Application of WFMJ Broad. Co.* (hereinafter "*Traficant*"), 566 F. Supp. 1036, 1042 (N.D. Ohio 1983) ("The

jury has been admonished repeatedly to avoid media reports of the trial proceedings and this

Court cannot find that release of the tapes will increase the likelihood that the jury will disregard

its instructions. . . . Furthermore, the jury will hear the tapes played during the trial.").

Second, even more importantly, courts have resoundingly rejected the notion that a court

may simply assume that listening to an audiotape that a juror has already heard in court is

inherently more prejudicial than the juror's reading or watching some other news account of the

exact same tape. As the Fourth Circuit found, "the concern for juror taint is not well taken

regarding exhibits that have been fully published to the jury because it is unlikely that simply

seeing the evidence again through a media publication will endanger [the defendant's] right to a

fair trial." *Moussaoui*, 172 Fed. Appx. 1 at 5. *See also Valley Broadcasting*, 798 F.2d at 1295

(where danger of prejudice to criminal defendant posed by contemporaneous release of tapes

played at trial is limited to supposed "added prejudice that might result from broadcasting

excerpts of the tapes as opposed to simply describing their contents," court may not deny access

unless it "articulate[s] the factual basis for the danger without relying on hypothesis or

conjecture")[3]; *Myers*, 635 F.2d at 953 ("the possibility that the jurors, despite that admonition,

---

[3] The Ninth Circuit was especially skeptical of the suggestion that a juror's re-exposure to the actual evidence in a case would somehow be more prejudicial than a juror's exposure to reporting and commentary on that evidence:

> Although, as a practical matter, television heightens the risk that jurors will be inadvertently contaminated, the first amendment presupposes some danger of juror exposure by granting the media access to the trial. Moreover, the curious juror who disobeys his oath by watching a televised report on the trial will be contaminated whether or not the report airs footage from the tapes in evidence. The trial court is entitled to consider and weigh the likelihood of irregular jury behavior whenever to do so is not purely conjectural. However, here the district court speculated that jurors might not only violate their oaths but be incrementally prejudiced by the tapes themselves. Without articulable facts, such speculation was conjecture, and we hold that the district court abused its discretion by weighing this conjectural factor in its analysis.

might see the tapes of excerpts unflattering to the applicants again on television did not pose a significant risk to a fair trial"); *United States v. Berger*, 990 F. Supp. 1054, 1057 (C.D. Ill. 1998) (finding no factual basis for concluding that criminal defendant would suffer any greater prejudice if "a juror inadvertently sees on television a replay of the Governor's [videotaped] deposition" in a public corruption trial "than he would if a juror inadvertently sees a picture of the Governor on television with an excerpt of his deposition from the transcript placed underneath the Governor's picture"); *United States v. Wolfson*, 10 Media L. Rptr. (BNA) 2047, 2047 (N.D. Ill. 1984) ("Although the tapes will probably be republished in the form of radio or television broadcasts, this is no different than other reports of trials by the media, some of which could be considerably more prejudicial than simply replaying recorded conversations.") (attached hereto as Exhibit A).

Moreover, any argument that jurors in this trial would be prejudiced by exposure to the tapes in the media after hearing them in court is wholly inconsistent with the D.C. Circuit's rulings that even *potential* jurors at a subsequent trial (e.g., persons who might be called to serve on the jury at any retrial, at a separate trial of a defendant on related charges, or at the trial of an alleged co-conspirator) would not be prejudiced by hearing tapes for the *first time* in the news media. In *Mitchell*, the Circuit held that since "[t]ranscripts of these conversations have received wide circulation and have been reenacted in various forums", and "presumably will be replayed at any retrial", no material danger would likely be posed even if a juror in a subsequent retrial first heard the tapes through the news media. *See* 551 F.2d at 1262. *See also Jenrette*, 653 F.2d at 615 ("Protecting the rights of [defendants] in the event of new trials is a perfectly valid consideration, but our decision in *Mitchell* makes it clear that restricting the common law right to

---

*Valley Broadcasting Co. v. U.S. Dist. Court for Dist. of Nevada*, 798 F.2d 1289, 1297 (9th Cir. 1986).

inspect and copy judicial records is rarely the proper protection."); *Myers*, 635 F.2d at 954 ("We do not believe the public at large must be sanitized as if they would all become jurors in the remaining Abscam trials."); *United States v. Abegg*, No. 92-8022, 1993 WL 246145, at *3, 21 Media L. Rptr. (BNA) 1442, 1443 (S.D. Fla. Mar. 18, 1993) (rejecting as "simply too speculative" defendant's concern that publication of video and audio tapes admitted in evidence at trial would undermine his chances of seating an impartial jury in another case against him); *United States v. Maddox*, 7 Media L. Rptr. (BNA) 2600, 2601 (S.D. Fla. 1982) ("Now that a jury has been selected[, there is] no legitimate basis for denying" news agencies copies of videotapes as they are introduced at trial. . . . "[A]ny possible prejudice to defendants in other cases which may result from broadcast of these tapes is outweighed by the strong presumption in favor of permitting access to exhibits introduced at a public trial") (attached hereto as Exhibit B).  If the law presumes that jurors who first hear tapes through the news media before hearing them in court would not be prejudiced, the argument that a juror who has *already heard them in the trial* would threaten the fairness of the trial cannot possibly be sustained.

Indeed, we do not believe the Defendant can identify a single case from any jurisdiction in which the release of audio or videotape evidence has *ever* been held to render a trial unfair. Moreover, even if there were some hypothetical extraordinary situation where release could pose a risk to a fair trial, this case could not possibly be it.  On the contrary, the content and nature of the tapes of the defendant's grand jury testimony are far less even arguably incendiary or prejudicial than those whose release was required in many other cases, such as the undercover Abscam videotapes, the Nixon tapes, the Hinckley-Foster tapes, or 911 tapes and cell phone calls from people dying inside the World Trade Center.

Similarly, the nature of the hypothetical "special cases" that the D.C. Circuit has suggested might justify denial of public access to taped evidence make plain that this trial is not such a case. The Circuit has pointed to examples such as "pornographic movies and tapes of wiretapped conversations," or "recordings of bedroom or other intimate conversations", which bear no remote resemblance to the tapes at issue here. *Mitchell*, 551 F.2d at 1260, 1263.[4] Similarly, in *Moussaoui* the court denied access to the cockpit recordings of Flight 93 because of their extraordinary impact on the sensibilities of the victims' families. In fact, the only circumstance that this Circuit has posited in which a denial of access might be justified on *fair trial grounds* concerns exhibits used in pre-trial proceedings, such as an "inadmissible confession," since the jury may never see them. *See Jenrette*, 653 F.2d at 616; *see also United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) (requiring the sealing of documents used only in a pre-trial suppression hearing). Those concerns plainly are not present here.

III.    ALL OTHER FACTORS IN THIS CASE REQUIRE THAT THE PRESUMPTION OF ACCESS TO THE TAPES BE APPLIED

Finally, all other factors in this case point to affirming the normal presumption of access to these tapes. In *Jenrette*, the Court of Appeals noted five factors to be weighed when considering whether to grant such an application:

> *First*, the fact that the tapes were admitted into evidence and played to the jury weighs heavily in favor of the application [for access]. . . . *Second*, the tapes had been seen and heard by those members of the press and public who attended the trial. . . . *Third*, the tapes contain only admissible evidence [and] were introduced for the purpose of proving the guilt of the defendants . . . . Thus, releasing the tapes will promote the integrity of the judicial process, for such will open at least part of the proceedings to those members of the public who could not attend the trial . . . . *Fourth*,

---

[4] Moreover, as previously discussed, the D.C. Circuit has in fact required the release of secretly recorded conversations, as have other courts. *See, e.g., Jenrette*, 653 F.2d at 611; *Traficant*, 566 F. Supp. at 1038-39.

> the nature of the trial itself is a factor which provides strong
> support for the application. [T]his case involves issues of major
> public importance [and] a high government official . . . . *Finally*,
> the tapes sought are fully encompassed by the presumption in favor
> of access to judicial records.

653 F.2d at 614 (emphasis added). *See also Myers*, 635 F.2d at 952 (presumption in favor of

permitting public inspection and copying "is especially strong in a case like this[,] where the

evidence shows the actions of public officials"). Each of these considerations overwhelmingly

supports the same result here – granting access to the tapes for public dissemination once they

are played to the jury. *See also, e.g., In re Charlotte Observer*, 882 F.2d 850, 856 (4th Cir. 1989)

(even a "minimal delay" in making judicial records public "unduly minimizes, if it does not

entirely overlook, the value of 'openness' itself, a value which is threatened whenever *immediate*

access to ongoing proceedings is denied, whatever provision is made for later public

disclosure"); *United States v. Hernandez*, 124 F. Supp. 2d 698, 706 (S.D. Fla. 2000) (ordering

parties to furnish copy of each exhibit to media at end of each day of trial); *Abegg*, 1993 WL

246145, at *1, 21 Media L. Rptr. (BNA) at 1444 (ordering parties to make copies of videotapes

"available at the proceeding in which they are offered so that those copies can be released to [the

media intervenor] immediately after the tapes are introduced in evidence").

Moreover, as this Court observed in *Hinckley*, the public's right of access is entitled to

particular weight where tape-recorded exhibits constitute "real evidence" of the matters at issue

in the trial proceeding. *See* 537 F. Supp. at 1173; *see also In re NBC Universal, Inc.*, 426

F.Supp.2d 49, 55 (E.D.N.Y. 2006) (access especially justified where "[t]he videotapes were of

the criminal conduct; they constituted direct evidence of the operative facts of the crimes

charged"). In this case, the defendant's testimony on the tapes is what a substantial portion of

this case is all about. Indeed, the very fact that the Special Counsel apparently believes that it is

important for the jury to actually hear the defendant's grand jury testimony, as opposed to reading or hearing transcripts, highlights why it is important for the public to be able to do the same in order to evaluate the jury's ultimate verdict.

As a federal court in Ohio recognized more than two decades ago during another trial of a public official, "transcripts are not a substitute for the tapes which are the actual evidence." *Traficant*, 566 F. Supp. at 1041 (citation omitted). The court in that case likewise was asked by the defendant – then a county sheriff – to preclude media copying of audiotapes that formed the basis of the charges against him and that were to be played for the jury at trial. The court, however, overruled the defendant's objection to contemporaneous public release of tape-recorded exhibits and ordered that copies of the tapes be distributed to a press pool after they had been played in full for the jury. In explaining the decision to release the tapes during trial, the court observed that "[t]he presumption in favor of access is especially strong in a case where the evidence reveals the actions of public officials" and where the actions in question relate to a matter of substantial public concern. *Id.* Furthermore, the court said, release of the tapes would give members of the public "their own opportunity to evaluate [the defendant's state of mind] themselves by listening to the inflection in the voices of those recorded, as well as their tone of voice, their delivery and the timing of their remarks." *Id.* at 1043. This case involves essentially identical considerations. In short, *all* factors support the application of the normal presumption of access to the tapes of the Defendant's grand jury testimony.

## CONCLUSION AND PRAYER FOR RELIEF

In the circumstances of this case, the Defendant cannot offer any basis for overcoming the public's First Amendment and common law rights to inspect and copy the tapes.

WHEREFORE, the Media Applicants respectfully request that the Court make such tapes

available for copying as soon as practicable following their publication to the jury.

Dated: February 2, 2007

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ LLP

By: _____

David A. Schulz  (D.C. Bar No. 459197)
Nathan Siegel (D.C. Bar No. 446253)
Thomas Curley (D.C. Bar No. 473798)
John B. O'Keefe (D.D.C. Bar No. D00289)

1050 Seventeenth Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888

*Counsel for Media Applicants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I caused true and correct copies of the foregoing Application for Access to Copies of Audio Recordings of Grand Jury Proceedings Played at Trial to be served via first-class mail, postage prepaid, upon the following:

Patrick Fitzgerald, Esq.
Debra R. Bonamici, Esq.
Office of the United States Attorney/Office of the Special Counsel
Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

Kathleen Kedian, Esq.
Peter Robert Zeidenberg, Esq.
U.S. DEPARTMENT OF JUSTICE
1400 New York Avenue, N.W.
Washington, DC 20005

John DeWitt Cline, Esq.
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104-1500

Joseph A. Tate, Esq.
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104

William H. Jeffress, Jr., Esq.
Alex Joseph Bourelly, Esq.
Alexandra M. Walsh, Esq.
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Theodore V. Wells, Jr., Esq.
James Lewis Brochin, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, NY 10019-6031

John B. O'Keefe

*Shiner v. Florida Transportation Department*, 9 Med.L.Rptr. 1672 (Fla. 4th Cir.Ct. 1983); *Hancock v. Wilkinson*, 8 Med.L.Rptr. 2566 (Fla. 10th Cir.Ct. 1982).

Plaintiff SHAW has failed to meet his burden in overcoming Movants' privilege, and, therefore, it is hereby:

ORDERED AND ADJUDGED that the Motions of RAY BOETEL and NEWS AND SUN-SENTINEL COMPANY to quash subpoena of journalist and for protective order be and the same are hereby granted.

---

## U.S. v. WOLFSON

### U.S. District Court
### Northern District of Illinois

UNITED STATES OF AMERICA v. DEAN WOLFSON, No. 83 CR 976–1, July 3, 1984

### NEWSGATHERING

#### Access to records—Judicial (§38.15)

Criminal defendant's failure to show that television networks' copying of tape recordings introduced into evidence would jeopardize his fair trial rights warrants federal district court's approval of magistrate's recommendation (10 Med.L.Rptr. 1828) to grant network's application to copy such tapes.

---

Television networks file application to copy audiotapes introduced into evidence at criminal trial. A federal magistrate recommended approval of the application (10 Med.L.Rptr. 1828).

Application granted.

James H. Alesia, Samuel Fifer, and Gerald F. Lutkus, of Reuben & Proctor, Chicago, Ill., for NBC.

David P. Sanders, of Jenner & Block, Chicago, for ABC.

Thomas H. Morsch, Shalom L. Kohn, and Lisa Hausten, of Sidley & Austin, Chicago, for CBS.

### Full Text of Opinion

McMillen, J.:

This case comes on the applications of certain television networks to copy tape recordings which the government will introduce at trial. The applications were referred to Magistrate Sussman who has recommended that the tapes be released to the applicants [10 Med.L.Rptr. 1828]. The defendant has filed objections to this recommendation, but the government has taken no position.

We do not share the defendant's fear that release of these recordings to the media after they have been introduced into evidence will cause prejudice to him and a possible mistrial. Although the tapes will probably be republished in the form of radio or television broadcasts, this is no different than other reports of trials by the media, some of which could be considerably more prejudicial than simply replaying recorded conversations. The jury will be instructed to scrupulously refrain from reading or listening to any news reports or other similar publications by the media which may in any way relate to this case while they are engaged in the trial. If there is some reason to believe that a juror has accidentally or intentionally disobeyed these instructions, the matter can be investigated by a *voir dire* hearing at which each individual juror will be questioned in the presence of counsel but separately from all of the other jurors, as has been done by this court in a few instances. Seldom, if ever, has it been found necessary to take any action to remedy such a violation of instructions, although we can recall one case in which a juror was excused in the midst of a trial, and replaced by an alternate.

As our Court of Appeals has pointed out, release of public records, including tape recordings, depends upon striking a balance between the common law right to inspect and copy judicial records and a defendant's constitutional right to a fair trial. *United States v. Edwards*, 672 F.2d 1289, 1293 [8 Med.L.Rptr. 1145] (7th Circ. 1982). Defendant has not satisfied us that his right to a fair trial will be sufficiently jeopardized to justify withholding the evidence from the media. This is not to say that the defendant's right to a fair trial cannot be jeopardized by such a release, but this question can

only be decided when the actual facts occur, as in such cases as *Sheppard v. Maxwell,* 384 U.S. 333 [1 Med.L.Rptr. 1220] (1966) or *Estes v. Texas,* 381 U.S. 532 [1 Med.L.Rptr. 1187] (1965).

The remaining problem with the applications is the preservation of the integrity of the tape recordings. Therefore, the government will make copies of those portions which are published to the jury and release these copies to the media after the originals have been heard by the jury. This order will apply to all authorized representatives of the media unless otherwise ordered by the court.

---

# NEWTON v. FLORIDA FREEDOM NEWSPAPERS

### Florida District Court of Appeal First District

ROGER R. NEWTON v. FLORIDA FREEDOM NEWSPAPERS, INC., d/b/a PANAMA CITY NEWS HERALD, No. AT–425, March 2, 1984 [447 So.2d 906]

## REGULATION OF MEDIA CONTENT

### Defamation—Standard of liability—Actual malice (§11.301)

Public official's failure to show that allegedly false statements contained in newspaper's substantially accurate account of depositions given in criminal prosecution resulted from deliberate falsification or awareness of probable falsity warrants grant of summary judgment for newspaper.

Libel action against newspaper. From trial court decision granting summary judgment for newspaper, plaintiff appeals.

Affirmed.

Van P. Russell, of Watkins & Russell, Apalachicola, Fla., for appellant.

John A. Bussian, III, of Isler, Brown, Smoak, Harrison, Nabors & Bussian, Panama City, Fla., for appellee.

*Full Text of Opinion*

Ervin, J.:

In this appeal from entry of summary judgment in favor of appelle, Florida Freedom Newspapers, Inc., in a public official libel case, appellant Newton, Mayor of the City of Apalachicola, contends summary judgment was improperly granted in that the record discloses the article in question was published with actual malice. We disagree and affirm.

Before a public official may prevail in a libel action against a media defendant he must prove, with *convincing clarity,* that the alleged defamatory falsehood was "made with 'actual malice'—that is, *with knowledge that it was false or with reckless disregard of whether it was false or not.*" *New York Times Company v. Sullivan,* 376 U.S. 254, 279-280, 84 S.Ct. 710, 725-726, 11 L.Ed.2d 686 [1 Med.L.Rptr. 1527] (1964) (e.s.). That standard is satisfied only if there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 [1 Med.L.Rptr. 1586] (1968). *Accord Times Publishing Company v. Huffstetler,* 409 So.2d 112, 113 [8 Med.L.Rptr. 1028] (Fla. 5th DCA 1982). Here, as in *Huffstetler,* the record fails to show that the alleged false statements in the article resulted from deliberate falsification or awareness of probable falsity. Instead, the article, which is *substantially accurate,* simply recounts testimony given at depositions in an unrelated criminal prosecution and any inaccuracies are of only "minor significance when the entire story is considered." 409 So.2d at 113.

Because summary judgment should be more liberally granted where, as in this case, the constitutional standard of "actual malice" applies, *see Menendez v. Key West Newspaper Corporation,* 293 So.2d 751, 752 (Fla. 3d DCA 1974), we are unable to say, given the record before us, that the trial court erred in granted summary judgment.

AFFIRMED.

Zehmer, J., concurs.

Booth, J., dissents without written opinion.

Twentieth Judicial Circuit in and for Lee County, Florida, No. 81-4564CA–RWP, January 15, 1982

## NEWSGATHERING

### Access to records — Law enforcement (§38.17)

### Statutory right of access — State open records acts (§44.17)

Documents provided to defense counsel pursuant to demand for discovery in criminal prosecutions are public records subject to disclosure under Florida Public Records Act.

———

Newspaper seeks writ of mandamus to compel state attorney to permit inspection of documents given to defense counsel in three criminal cases.

Writ granted.

Steven Carta, of Smith, Carta, Ringsmuth & Kluttz, Fort Myers, Fla., for petitioner.

#### Full Text of Order

Pack, J.:

THIS CAUSE came on to be heard on January 4, 1982, upon the Order to Show Cause entered in this cause on December 16, 1981, and the Court, having been advised by counsel of a stipulated set of facts and having heard argument of counsel on the Petition and Response to and/or Motion to Dismiss or Strike Petition filed in this cause, enters the following opinion:

1. The Petitioner is the owner of a newspaper published in Lee County, Florida; and Respondent is the duly elected State Attorney for the Twentieth Judicial Circuit in and for Lee County, Florida.

2. On December 15, 1981, a reporter for Petitioner requested Respondent in writing to permit inspection of all documents given to defense counsel, pursuant to demand for discovery under Rule 3.220, Fla. R. Crim.P., in three criminal cases pending in Lee County, Florida, to wit: *State v. Hodges*, Case No. 81–1191CF–C; *State v. Iglesia*, Case No. 81–1191CF–D; and *State v. Petterson*, Case No. 81–1191CF–F. The request was refused by Respondent; and this action was instituted by Petitioner to compel inspection under Chapter 119, Florida Statutes.

3. Petitioner asserts its right of inspection of the documents under Section 119.011 (3) (c) (5), Fla. Stats. (1981) which excludes from the definition of "criminal intelligence information" and "criminal investigation information":

Documents given or required by law or agency rule to be given to the person arrested.

This statute was recently addressed in the case of *Satz v. Blankenship*, __So.2d__ [7 Med.L.Rptr. 2576] (Fla. 4th DCA 1981), decided December 23, 1981. In ruling that tape recordings were "documents" within the meaning of Section 119.011(3) (c) (5), the court in *Satz* held that "This provision reveals that once documents are released (under Rule 3.220, Fla.R.Crim.P.), the Legislature believed there is no longer a need for secrecy." The *Satz* case, therefore, is decisive of the issues in this case. In light of such decision, this Court concludes that the discovery documents sought are public records, not exempted by statute from the inspection provisions of the Public Records Law.

It is therefore,

ORDERED AND ADJUDGED that:

1. Respondent be and is hereby ordered to permit inspection of the subject documents by Petitioner forthwith, provided, however, that inspection be and is hereby stayed for a period of ten (10) days from the date of this Order to allow Respondent to file a Notice of Appeal of this Order during such period.

2. Petitioner's request for attorney's fee shall be considered at a subsequent hearing upon motion of Petitioner.

———

## U.S. v. MADDOX

### U.S. District Court
### Southern District of Florida

UNITED STATES OF AMERICA v. BILLY MADDOX, et al., No. 81-330-Cr-CA, January 12, 1982

## NEWSGATHERING

### Access to records — Judicial (§38.15)

Television station has right of access to videotapes introduced as evidence in criminal trial, despite speculative possibility that jurors may view tapes when broadcast

*Biermann v. Pulitzer Publishing*                                    7 Med. L. Rptr.  2601

and despite possibility of prejudice to defendants in other cases, since such assertions do not outweigh strong presumption in favor of access to exhibits introduced as evidence at public trial.

---

Television stations move for order permitting it to copy videotapes introduced into evidence at criminal trial.

Motion granted.

Paul J. Bonavia and Thomas R. Julin, of Steel Hector & Davis, Miami, Fla., for petitioners Wometco Enterprises, Inc., and Post-Newsweek Stations, Florida, Inc.

Sam Smargon and Paul DePaulo for U.S.

Jack Denaro, Edward J. O'Donnell, Rupert Neis, G. Russell Petersen, John Komorowski, Mark Heckner, Bruce Wilkinson, Donald Wright, Vincent Flynn, Talbot Tramell, Michael H. Tarkoff, Milton Grusmark, Sherill Javits, H. T. Smith, William Laswell, Greg Denaro, Richard Rhodes, Edward Carhart, and Edward Kirkland for defendants.

*Full Text of Order*

Atkins, J.:

THIS MATTER is before the Court on motion of Wometco Enterprises, Inc., et al. for an Order permitting them to copy video tapes as they are introduced into evidence at the trial of the above-styled case. The Government and the defendants, with the exception of defendant Gary Beyers, have no objection to the motion. For the reasons that follow, the motion is GRANTED.

Wometco earlier applied for a similar Order in connection with the trial of the defendant J. P. Browning. The Court denied Wometco's request primarily out of concern for the effect that broadcasting the tapes might have on selection of a jury in the upcoming trial of Browning's co-defendants. In denying Wometco's request, the Court stated that it would reconsider the matter after a jury was selected.

Now that a jury has been selected I see no legitimate basis for denying Wometco's request. I recognize the possibility that jurors may view the tapes on local television, but this speculative possibility does not warrant denying access to the tapes. The jurors will be cautioned not to listen to television broadcasts and I see no reason to assume they will ignore the Court's instructions. If problems do arise in this regard, the Court will consider sequestration.

I also recognize the legitimate concerns of defendants in other cases who are not named in this indictment. One such defendant, Elias Facuseh, has objected to release of the tapes urging that it will interfere with his right to a fair and impartial jury. The Government represents, however, that the tapes used in this case will not be used in any other case. I am convinced that any possible prejudice to defendants in other cases which may result from broadcast of these tapes is outweighed by the strong presumption in favor of permitting access to exhibits introduced at a public trial.

Accordingly, it is ORDERED AND ADJUDGED that

1. The application of Wometco Enterprises, Inc., et al. for permission to copy videotapes that are admitted into evidence and played in open court is granted.

2. Wometco shall make appropriate arrangements for copying the tapes as outlined in their application.

3. Other news agencies wishing to obtain copies of the tapes should make appropriate arrangements with representatives of Wometco.

DONE AND ORDERED at Miami, Florida, this 12th day of January, 1982.

---

# BIERMANN v. PULITZER PUBLISHING

### Missouri Court of Appeals
### Eastern District

JAMES BIERMANN v. THE PULITZER PUBLISHING COMPANY, d/b/a/ St. Louis Post-Dispatch, No. 43424, December 29, 1981

## REGULATION OF MEDIA CONTENT

### Defamation — Privilege — In general (§11.451)

Newspaper article that erroneously identified plaintiff, James Biermann, as person arrested on drug charges and that was based upon police arrest warrants, bonds, and affidavits that all identified

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------------------------------   x
                                                   :
IN RE                                              :
                                                   :
UNITED STATES OF AMERICA,                          :
     vs.                                           :   Miscellaneous Case No. _____
                                                   :
I. LEWIS LIBBY,                                    :
Criminal Case No. 05-394 (RBW)                     :
                                                   :
------------------------------------------------   x
```

## CERTIFICATE OF DISCLOSURE PURSUANT TO RULE 7.1

The undersigned counsel for the Media Applicants certifies to the best of my knowledge and belief that the information below is accurate. These representations are made pursuant to Local Civil Rule 7.1 in order that judges of this Court may determine the need for recusal.

The following Media Applicants have no publicly held stock and have no parents or related corporate entities with publicly held stock: the American Society of Newspaper Editors, the Associated Press, National Public Radio, Inc., the Newspaper Association of America, the Radio-Television News Directors Association, the Reporters Committee for Freedom of the Press, and the Society of Professional Journalists.

The remaining Media Applicants make the following disclosures:

ABC, Inc. is an indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly traded corporation.

Bloomberg News is owned by Bloomberg L.P., a privately held limited partnership. Merrill Lynch Pierce Fenner & Smith, Inc., a publicly traded company, owns more than 10% of its stock.

Cable News Network LP, LLLP is a division of Turner Broadcasting System, Inc., which is a subsidiary of Time Warner Inc., a publicly traded company.

CBS Broadcasting Inc. is a wholly-owned subsidiary of CBS Corporation, a publicly traded company.

Dow Jones & Company, Inc. is a publicly traded company.

The E.W. Scripps Company is a publicly traded company.

Hearst Corporation is a privately held corporation and is majority owner of Hearst-Argyle Television, Inc., a publicly traded company.

The McClatchy Company is a publicly traded company.

NBC News is a division of NBC Universal, Inc. The General Electric Company, a publicly traded company, is the parent corporation of NBC Universal. Vivendi, S.A., a publicly traded entity, also owns more than 10% of the stock of NBC Universal.

Tribune Company is a publicly traded company. It is participating in this Application on behalf of its newspapers *Allentown Morning Call*, *Baltimore Sun*, *Chicago Tribune*, *Newsday*, *Hartford Courant*, *Los Angeles Times*, *Orlando Sentinel*, *South Florida Sun-Sentinel*, and Tribune Broadcasting.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of The Washington Post Company, a publicly traded company. Berkshire Hathaway, Inc., a publicly held company, has a 10% or greater ownership interest in The Washington Post Company.

USA TODAY is a division of Gannett Satellite Information Network, Inc., which is a subsidiary of Gannett Co., Inc., a publicly traded company.

2

Dated: February 2, 2007

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ LLP

By:_____

David A. Schulz  (D.C. Bar No. 459197)
Nathan Siegel (D.C. Bar No. 446253)
Thomas Curley (D.C. Bar No. 473798)
John B. O'Keefe (D.D.C. Bar No. D00289)

1050 Seventeenth Street, NW, Suite 800
Washington, DC 20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888

*Counsel for Media Applicants*

3